**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

———————————————————
                        :

MARCO PALMERI,               :

                        :

        Plaintiff,         :

                        :        Civil Action No. 07-5706 (JAG)

          v.           :

                        :         **AMENDED**

LG ELECTRONICS USA, INC.,   :         **OPINION**

                        :

        Defendant.       :

———————————————————
                        :

**GREENAWAY, JR., U.S.D.J.**

       This matter comes before this Court on the motion to dismiss the First Amended

Complaint by defendant, LG Electronics USA, Inc. ("LG" or "Defendant"), pursuant to FED. R.

CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted.  For the reasons set

forth below, Defendant's motion to dismiss shall be granted in part, and denied in part.

## I.  BACKGROUND

       Plaintiff Marco Palmeri ("Plaintiff"), resides at 20 Bishop Road West in Hartford,

Connecticut.  (First Am. Compl. at ¶ 1.)  Defendant LG Electronics USA, Inc. is a New Jersey

corporation that maintains its headquarters at 1000 Sylvan Avenue, Englewood Cliffs, New

Jersey 07632.  (Id. at ¶ 15.)  LG Electronics USA, Inc. has done business throughout the United

States and in the State of New Jersey.  (Id.)  LG Electronics USA, Inc. is the North American

subsidiary of LG Electronics, Inc., a Korean corporation.  (Id.)

       Defendant holds itself out to the public as a manufacturer of safe, cutting-edge, and easy-

to-use home appliances, including refrigerators.  (Id. at ¶ 19.)  Defendant is in the business of manufacturing, producing, distributing, and/or selling refrigerators with full water-dispensing and ice-making features.  (Id.)  Defendant has manufactured, produced, and distributed refrigerators for several leading retailers in the United States, including Home Depot, Sears, Best Buy and other large retail chains.  (Id. at ¶ 20.)  Defendant manufactures thousands of refrigerators each year, a substantial portion of which are sold or offered for sale in New Jersey.  (Id. at ¶ 21.)

Defendant has sold, either directly or indirectly, thousands of units of Defective Refrigerator Products nationwide and in the State of New Jersey.  (Id.)  Defendant makes numerous express warranties about the quality of its refrigerators, including presenting premium water filtration as an important feature of LG refrigerators.  (Id. at ¶ 22.)  For example, Defendant claims that it "install[s] the Premium Water Purification System to the entire side-by-side refrigerator line to make drinking water safe and convenient for consumers."  (Id.)

In the product brochure printed in May 2006 for the LG LFX25960 Panorama French Door Refrigerator purchased by Plaintiff, LG represents that the refrigerator features a "Premium Water Filtration System."  (Id. at ¶ 23.)  The product brochures for several of LG's water and ice dispensing refrigerators printed at or around the same time, similarly state that those refrigerators feature a "Premium Water Filtration System."  (Id. at ¶ 24.) In addition, LG's marketing material, found at numerous online retailers selling LG's water and ice-dispensing refrigerators, lists "Premium Water Filtration System" as a bullet point under the heading "Features."  (Id. at ¶ 25.)

In conjunction with each sale, Defendant marketed, advertised, and warranted that the Defective Refrigerator Products were fit for the ordinary purpose for which such goods were used and would, at a minimum, produce water and ice that was free from toxic and potentially

carcinogenic volatile organic compounds.  (Id. at ¶ 26.)  Defendant manufactured and distributed the Defective Refrigerator Products intending that consumers would purchase the refrigerator products, regardless of place of purchase, or the location where customers actually use them.  (Id. at ¶ 27.)  The Defective Refrigerator Products were placed into the stream of commerce, distributed, and, ultimately, offered for sale and sold to Plaintiff, as well as purchasers in New Jersey and the United States.  (Id.)  Defendant intended for customers to believe its statements and representations about its refrigerator products, and to trust that its refrigerators are of first-rate quality.  (Id. at ¶ 28.)

Defendant LG Electronics USA manufactured, marketed, and advertised, warranted, and sold, either directly or through their authorized distribution channels, the Defective Refrigerator Products.  (Id. at ¶ 29.)  The Defective Refrigerator Products were sold under more than 11 model numbers, including popular LG model numbers such as LFX25950, LFX25960, LFX21980, LFX21960, LSC27991, LSC27926, LSC27950, and LRSC26923.  (Id. at ¶ 30.)  Retailers who sold the contaminated products include Home Depot, Sears and Best Buy, among others.  (Id.)

Plaintiff purchased an LG refrigerator with water-dispensing and ice-making capabilities, model LFX25960TT, on May 3, 2007, from Home Depot, store number 6210, in West Hartford, Connecticut.  (Id. at ¶¶ 14, 31.)  Plaintiff quickly noticed that the water and ice that was produced by the LFX25960TT had an odd and unpleasant odor.  (Id.)  Plaintiff, who is employed by the Connecticut Department of Health, describes the odiferous smell and unnatural taste as being akin to that of a "plastic chemical."  (Id.)

Plaintiff had the water from his LFX25960TT's dispenser tested by the State of

3

Connecticut's Department of Public Health Laboratory ("DPHL") and Phoenix Environmental Laboratories, Inc. ("PEL").  (Id. at ¶ 32.)  Both laboratories found that the water contained high levels of toxic and potentially carcinogenic volatile organic compounds ("VOCs"), including ethylbenzene, styrene and toluene.  (Id.)

On May 25, 2007, the State of Connecticut's DPHL analyzed a water "test sample" taken from Plaintiff's LFX25960TT refrigerator.  (Id. at ¶ 33.)  When compared to a laboratory field blank ("control sample") which did not contain measurable VOCs, it was determined that the sample taken from Plaintiff's LFX25960TT refrigerator contained high levels of toxic and potentially carcinogenic VOCs, specifically ethylbenzene, styrene and toluene.  (Id.)  According to the DPHL results, the test sample contained approximately 13, 16, and 8.5 micrograms per liter, of ethylbenzene, styrene and toluene, respectively.  (Id. at ¶ 34.)  The DPHL noted that unusually high levels of these toxic and potentially carcinogenic VOCs in the test sample and advised Plaintiff to stop drinking the contaminated water from the dispenser because the contaminated water posed a serious health hazard.  (Id.)

On June 12, 2007, the PEL analyzed three water "test samples," two of which were taken from Plaintiff's LFX25960TT refrigerator and one taken from Plaintiff's kitchen tap.  (Id. at ¶ 35.)  When compared to a laboratory field blank ("control sample") which did not contain measurable VOCs, it was determined that the two test samples taken from Plaintiff's LFX25960TT refrigerator contained high levels of toxic and potentially carcinogenic VOCs, specifically ethylbenzene, styrene and toluene.  (Id.)  Additionally, it was determined that the test sample taken from Plaintiff's kitchen tap also did not contain measurable levels of VOCs.  (Id.)  According to the PEL results, the first test sample taken from the Defective Refrigerator Product,

4

which was collected early in the morning, contained approximately 8.6, 8, and 4.1 micrograms

per liter, of ethylbenzene, styrene and toluene, respectively.  (Id.)  The second test sample from

the Defective Refrigerator Product, which was collected after running the water dispenser for

several minutes, contained approximately 0.97 micrograms per liter of ethylbenzene.  (Id. at ¶

37.)  The third test sample, taken from Plaintiff's kitchen tap contained no measurable levels of

ethylbenzene, styrene or toluene.  (Id. at ¶ 38.)  The PEL noted the unusually high levels of these

toxic and potentially carcinogenic VOCs in the test samples from Plaintiff's refrigerator.  (Id. at ¶

39.)  PEL advised Plaintiff to stop drinking the contaminated water from the dispenser because

the contaminated water posed a serious health hazard.  (Id.)

      Plaintiff brings this suit as a class action on behalf of himself and on behalf of all others

similarly situated (the "Class"), pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3).  (Id.

at ¶ 40.)

## II.  STANDARD OF REVIEW

      A complaint should be dismissed only if the alleged facts, taken as true, fail to state a

claim.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000).  The

question is whether the claimant can prove any set of facts consistent with his allegations that

will entitle him to relief, not whether that person will ultimately prevail.  Scheuer v. Rhodes, 416

U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

      A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to

articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 127 S. Ct. 1955, 1974 (2007); see also In re Warfarin, 214 F.3d at 397 (stating that a

complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim).

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 127 S. Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (internal citations omitted); see also FED. R. CIV. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1965 (internal citations omitted). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure Civil 2d § 1357 at 340) (2d ed. 1990).

A court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384-85 (3d Cir. 1994); see also Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 n.8 (3d Cir. 1997). "The defendant bears the burden of showing that no claim has been presented." Hedges v. United

6

States, 404 F.3d 744, 750 (3d Cir. 2005).

In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1357 (3d ed. 2007).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

The court's review of the sufficiency of a *pro se* complaint, "however inartfully pleaded," is less stringent than its review of pleadings prepared by lawyers.  Haines v. Kerner, 404 U.S. 519, 520 (1972).  A court must assume a *pro se* plaintiff's factual allegations are true and construe his claim liberally.  See Nietzke v. Williams, 490 U.S. 319, 330 n.9; Roman v. Jeffes, 904 F.2d 192, 197 (3d Cir. 1990).

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."  Ashcroft v. Iqbal et al., 129 S.Ct. 1937, 1950 (2009).

## III.  ANALYSIS

### A.  Choice of Law

A federal district court sitting in diversity must apply the choice of law principles of the

forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  The New

Jersey Supreme Court has established these choice of law rules:

> [T]he determinative law is that of the state with the greatest interest in governing the
> particular issue.  The first step in the analysis is to determine whether a conflict exists
> between the law of the interested states.  Any such conflict is to be determined on an
> issue-by-issue basis.  If an actual conflict exists, the next step is to identify the
> governmental policies underlying the law of each state and how those policies are
> affected by each state's contacts to the litigation and to the parties.  If that state's contacts
> are not related to the policies underlying its law, then that state does not possess an
> interest in having its law apply.  Consequently, the qualitative, not the quantitative, nature
> of a state's contacts ultimately determines whether its law should apply.

Vezey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1986).

This Court finds that a clear conflict exists between New Jersey and Connecticut law.

Under Connecticut law, only Plaintiff's product liability claim would be viable.  The Connecticut

Product Liability Act, CONN. GEN. STAT. ANN. § 52-572m-q ("CPLA"), states that a plaintiff

who asserts a product liability claim may assert no other claim: "A product liability claim . . .

shall be in lieu of all other claims against product sellers . . . for harm caused by a product."  Id.

at § 52-572n(a).  The Connecticut Supreme Court has interpreted the CPLA as the "exclusive

means by which a party may secure a remedy for an injury caused by a defective product." Hurly

v. Heart Physicians, P.C., 898 A.2d 777, 788 (Conn. 2006).

Under New Jersey's Products Liability Act, N.J. STAT. ANN. § 2A:58C-1 et seq.

("NJPLA"), Plaintiff is similarly barred from asserting multiple claims predicated on harm

caused by a product.  As the New Jersey Supreme Court has articulated, virtually all possible

causes of action are precluded by products liability claims.  "The language chosen by the

Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all

possible causes of action in relating to harms caused by consumer and other products . . . . "[T]he

PLA is paramount when the underlying claim is one for harm caused by a product."  Sinclair v.

Merck & Co., 948 A.2d 587, 595-96 (N.J. 2008).  The NJPLA, however, permits claims for

breach of express warranty, in addition to a products liability claim.  See N.J. STAT. ANN. §

2A:58C-1(b)(3).

 When two states authorize different causes of action arising out of the same set of facts, a

clear conflict exists between the laws of the two states.  See Torres v. Lucca's Bakery, 487 F.

Supp. 2d 507, 513 (D.N.J. 2007) ("When dealing with liability based on negligence, strict

liability, products liability or the like, differing rules as to liability or damages generally represent

genuine conflicts since the laws covering these issues take into account both the needs of the

injured plaintiffs and the economic viability of the defendants." )

 Connecticut has a greater interest in having its law govern this dispute.  Plaintiff is a

Connecticut resident and is an employee of the State of Connecticut.  Plaintiff purchased his

refrigerator in Connecticut and used his refrigerator in Connecticut.  Plaintiff allegedly suffered a

problem with the refrigerator in Connecticut.  Plaintiff has had the refrigerator tested at two

laboratories in Connecticut.

 New Jersey's only connection to this litigation is that the manufacturer of the refrigerator,

LG, has corporate headquarters in New Jersey.  New Jersey has a tenuous connection to the harm

caused to Plaintiff as a result of Defendant's alleged defective product and as such has little

interest in having its products liability law protect the interest of a non-resident.  See Deemer v.

Silk City Textile Mach. Co., 475 A.2d 648, 651 (N.J. Super. Ct. App. Div. 1984) ("New Jersey has no interest in protecting the compensation rights of a non-domiciliary resident.  Indeed, our Supreme Court's decision in Heavner v. Uniroyal, Inc. appears to evidence a policy of discouraging forum shopping where, as here, the contacts with the State are at best tenuous.") (citations omitted).

This Court finds that Connecticut law should govern the resolution of Plaintiff's claims in this action.

**B.  Plaintiff States A Claim Under the Connecticut Products Liability Act**

The Connecticut Product Liability Act, CONN. GEN. STAT. ANN. § 52-572m-q ("CPLA"), states that a plaintiff who asserts a product liability claim may assert no other claim: "A product liability claim . . . shall be in lieu of all other claims against product sellers . . . for harm caused by a product."  Id. at § 52-572n(a).  The Connecticut Supreme Court has interpreted the CPLA as the "exclusive means by which a party may secure a remedy for an injury caused by a defective product." Hurly v. Heart Physicians, P.C., 898 A.2d 777, 788 (Conn. 2006).  The CPLA defines a product liability claim to include "all claims or actions brought for personal injury . . . or property damage caused by the manufacture, . . . design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product." CONN. GEN. STAT. ANN. § 52-572m(b).

Plaintiff clearly asserts a products liability claim based on the facts of the Complaint.  In Count V of the First Amended Complaint, entitled, "Strict Product Liability", Plaintiff alleges that Defendant sold refrigerators that were "defective in design" and claims that the product was "sold without adequate warnings." (First Am. Compl. at ¶¶ 73-74.)  The Connecticut Supreme

Court has held that the CPLA includes claims that a "product was defectively designed" and that the defendant "failed to warn."  Hurley, 898 A.2d at 788.

In Count II of the Complaint, Plaintiff asserts a cause of action under the Connecticut Unfair Trade Practices Act (CUTPA), CONN. GEN. STAT. ANN. § 42-110a, et seq.  CUTPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  CONN. GEN. STAT. ANN. § 42-110(b).  This Court finds that based on the facts of the Complaint, Plaintiff has more properly stated a claim under CPLA.  As the Connecticut Supreme Court explained, "the language of the exclusivity provision makes clear that the [liability act] was intended to serve as the exclusive remedy for a party who seeks recompense for those injuries caused by a product defect."[1]  Hurley, 898 A.2d at 789.  Since the crux of Plaintiff's allegations against LG is based on an allegedly defective refrigerator, this Court finds that Plaintiff's CUTPA claim (Count II) is barred by the exclusivity provisions of the CPLA.

The CPLA also bars the portion of Plaintiff's Strict Products Liability Claim (Count V) that seeks recovery for risk of personal injury.  CPLA plaintiffs may seek recovery only for "damage to property, including the product itself, and personal injuries." CONN. GEN. STAT. ANN. § 52-572m(d).  Plaintiff alleges in the Complaint that he may suffer future harm from

---

[1] The Connecticut Supreme Court has stated that the exclusivity provisions of the CPLA do not exclude all CUTPA claims.  "The language of the exclusivity provision, however, suggests that it was not designed to serve as a bar to additional claims, including one brought under CUTPA, either for an injury not caused by the defective product, or if the party is not pursuing a claim for personal injury, death or property damage." Hurley, 898 A.2d at 789.  This Court finds, however, that Plaintiff's CUTPA claim is premised on allegations that LG sold a defective product to the public or that LG's actions resulted in damage to property, and it is thus barred by the exclusivity provisions of the CPLA.

exposure to harmful chemicals.  "Both the DPHL and PEL testing laboratories told Plaintiff to stop drinking the water from the dispenser of the refrigerator because the toxic and potentially carcinogenic chemicals emanating from the water and the ice produced by the dispenser could cause serious health problems to the Plaintiff and his family."  (First. Am. Compl. at ¶ 6.)

The Connecticut Supreme Court has interpreted CPLA to encompass claims only where a plaintiff has suffered actionable harm: "In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm.  Actionable harm occurs when the plaintiff discovers or should discover, through the exercise of reasonable care, that he or she has been injured and that the defendant's conduct caused such injury." Champagne v. Raybestos-Manhattan, Inc., 562 A.2d 1100, 1107 (Conn. 1989).  To the extent that Count V seeks recovery for risk of personal injury, Plaintiff fails to state a claim upon which relief can be granted.[2]  Plaintiff has stated a claim under CPLA for damage to the refrigerator itself.

Plaintiff asserts violations of the New Jersey Consumer Fraud Act (Count I), Breach of Express Warranty (Count III), Breach of the Implied Warranty of Merchantability (Count IV), and Unjust Enrichment (Count VI), which, based on the application of the CPLA, are also barred by exclusivity provisions of the CPLA.  As the Connecticut Supreme Court explains, "[T]he legislature clearly intended to make our products liability act an exclusive remedy for claims falling within its scope." Gerrity v. R.J. Reynolds Tobacco, 818 A.2d 769, 773 (Conn. 2003). "[A] product liability claim is defined broadly to include, but not be limited to, all actions based

---

[2] This Court's ruling regarding the viability of a claim for the risk of personal injury does not adversely affect Plaintiff's ability to articulate a claim for personal injury, in futuro, if such injury became evident at a later date and Plaintiff could prove causation arose from water imbibed from the Defective Refrigerator Product.

on "[s]trict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."  Id. at 774.  The Supreme Court of Connecticut's edict in Gerrity makes it clear that Counts I, III, IV, and VI must be dismissed, with prejudice.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the First Amended Complaint, pursuant to FED. R. CIV. P. 12(b)(6), shall be granted, in part, and denied in part.


                                        S/Joseph A. Greenaway, Jr.
                                        JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date:  July 6, 2009